

# In the
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

No. 06-25-00159-CR

ANTHONY SCOTT BENNETT, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the Criminal District Court No. 1
Tarrant County, Texas
Trial Court No. 1743301

Before Stevens, C.J., van Cleef and Rambin, JJ.
Memorandum Opinion by Chief Justice Stevens

MEMORANDUM OPINION

Anthony Scott Bennett was indicted for and found guilty of the felony offense of murder by a Tarrant County jury.[1]  *See* TEX. PENAL CODE ANN. § 19.02(c) (Supp.).  Bennett was sentenced to fifty years' confinement.  On appeal, Bennett argues that (1) his conviction is "contrary to established Texas justification laws after [his] use of force was in self-defense," and (2) his sentence is cruel and unusual.  Because we find that the evidence was sufficient to reject Bennett's self-defense claim and Bennett failed to preserve his Eighth Amendment[2] complaint for our review, we affirm the trial court's judgment.

## I.     Evidence at Trial

Justin Aldridge testified that he and his family were driving on Southwest Parkway when they took notice of a Harley Davidson motorcycle pulling onto the highway.  Aldridge explained that he is familiar with motorcycles, having been a motorcycle rider for many years.  The motorcycle was noticeably loud because it did not have a muffler.  He explained that in his experience, it would be difficult to hear another person while riding a motorcycle "over [forty-five] miles an hour."

Aldridge's vehicle was equipped with a dash camera, which he explained was for his own safety on the road.  On the day in question, his dash camera was turned on and recording.  Aldrige's dash camera captured the motorcycle entering the highway and driving behind a "gray

---

[1]This appeal was transferred to this Court from the Second Court of Appeals pursuant to a Texas Supreme Court docket equalization order.  *See* TEX. GOV'T CODE ANN. § 73.001 (Supp.).  Accordingly, we apply the precedent of the Second Court of Appeals in deciding this case to the extent that it conflicts with our own.  *See* TEX. R. APP. P. 41.3.

[2]U.S. CONST. amend. VIII.

Chevy compact car." At some point, the motorcycle and the gray Chevrolet car began switching lanes and swapping positions, which Aldridge took note of because "it just seemed like an awful lot of traffic movement around [him]." At some point soon after, Aldridge explained that he believed he heard the motorcycle backfire but then realized it was gunshots behind him. When he looked in his rear-view mirror, he "saw the rider put his hands down to his side and kind of looked up at the sky and fell backwards off his motorcycle." The gray car then made a "hard right" to exit the highway, paused, and then sped away.

After the rider fell off the motorcycle, the motorcycle continued down the highway a bit on its own, "eventually veering to the left and riding against the concrete barrier." When the motorcycle stopped, Aldridge stopped his vehicle and "ran back to assist." There were additional bystanders who had stopped to assist the rider and render aid along with Aldridge. Aldridge noted that the rider had "severe bleeding coming from his groin area, which [he] knew . . . was probably a femoral artery type injury." When the emergency responders arrived on the scene, Aldridge offered the chip from his dash camera to the police, which they accepted.

Aldridge stated that while he was assisting in rendering aid, he noticed that the rider was wearing a vest that stated he was a member of the Aryan Brotherhood. On cross-examination, Aldridge admitted that he was not fully aware of what the Aryan Brotherhood was, but defense counsel explained it was a white-supremacy prison gang, not a motorcycle club. Aldridge also agreed that he was unaware of anything that may have occurred between the motorcycle rider and the driver of the gray car prior to noticing them on the highway. One of Aldridge's children noticed that the gray car had bumper stickers on it that indicated that the vehicle driver was or

3

supported homosexuals. While Aldridge did not see the motorcycle rider attempt to use it, he did agree that the motorcycle was equipped with something hanging from the handlebars that would allow the rider to "whip" someone, which Aldridge agreed was normally something a motorcycle gang would have.

Ty Tapp, a corporal with the Azle Police Department (APD), testified that when he reported to the scene of the incident, he noticed the fire department was attempting to contain the fire caused by the motorcycle crash and additional firefighters were "working on someone on the ground." Tapp stated that the victim's condition "did[ not] look good," as there was a lot of blood loss. In assisting with the victim, Tapp noticed "two gunshot wounds" on the victim as they were turning him over. After assisting with the victim and getting him on the stretcher, Tapp stated that he then "started to try to do [his] investigation for the police side." Tapp confirmed that the victim was wearing a vest with an insignia on it, and the victim also had a knife on his belt. Tapp agreed that the vest worn by the victim clearly indicated he was a member of the Aryan Brotherhood gang. No firearm was located at the scene, nor in the victim's saddlebag of his motorcycle. Tapp's investigation identified the victim as Brian Turner. Turner later died at the hospital.

Firefighter and paramedic for the Azle Fire Department (AFD), Mitchell Noah, explained that he and his unit were en route to a call for a fall at a gas station when their ambulance experienced a tire issue. Upon pulling over to assess the issue with the ambulance, a bystander to the motorcycle incident ran over to the ambulance and said to Noah, "Hurry up. We're losing him." Noah explained that as he approached the scene, he initially thought there was a grassfire,

4

but then noted a motorcycle leaning against the median, and "several bystanders circled around an individual." The bystanders were attempting to render aid. Noah stated that he then took an initial assessment of Turner, in which he noted that Turner was in critical condition. Noah explained that Turner was suffering from injuries that were consistent with gunshot wounds. Noah stated that a tourniquet was applied to Turner's leg in an attempt to stop the bleeding from the femoral artery gunshot wound. Turner was initially unconscious at the scene, but when given a dose of oxygen, he became alert and stated that he could not breathe. AFD then sedated him to allow for medical care. Turner went into cardiac arrest prior to CareFlite's arrival. AFD began cardiopulmonary resuscitation (CPR) until CareFlite arrived on scene and put him on the automated CPR compression device. Turner was then transported to a hospital via helicopter. The CareFlite crew informed Noah and his crew that Turner had passed.

Dr. Stacey Murthy, a medical examiner with the Tarrant County Medical Examiner's Office, confirmed that Turner suffered injuries from gunshot wounds to the right side of his back, his right arm, and two to his right thigh. Dr. Murthy testified that the gunshot wounds to Turner's right thigh broke his femur. Turner also suffered from brush-burn type abrasions on his arms, legs, head, and left hip, consistent with his body scraping the concrete. While she stated it was not of note to cause Turner's death, Dr. Murthy confirmed that Turner had THC, amphetamine, and Gabapentin in his system. Dr. Murthy stated that Turner's cause of death was gunshot wounds in the manner of a homicide.

Turner's mother, Gail Buckner, testified as to her son's background, family life, and their close bond. Buckner also admitted that she was aware that Turner was a member of the Aryan

Brotherhood-prison gang. She stated Turner had joined the gang while in prison and remained part of the gang when he was released. Buckner confirmed that Turner's periods of incarceration resulted from "forgery, fraud and theft type crimes" and possession of a firearm.

Sergeant Richard Lukowsky of the APD was called to the scene of the incident to investigate a shooting of a person on a motorcycle, where the suspect "had fled the scene." Lukowsky was called in as a criminal investigator for the case. He stated that his job was to locate evidence, view the scene, talk to witnesses, and photograph the scene and evidence. Three 0.90-millimeter shell casings were located on the secured stretch of highway constituting the crime scene.

A local daycare had surveillance-camera video footage of the incident that occurred on the highway and turned it over to the APD. The video recording depicts the shooting from start to finish, wherein it shows the motorcycle traveling in the left-hand lane and the gray car in the right lane, coming up quickly from behind the motorcycle. Before the gray car passes the motorcycle, the motorcycle rider's hands come off the handlebars, and he begins to fall off as the gray car passes him. According to Lukowsky, that accounts for the gunshot wound to Turner's back. Lukowsky, when asked about whether the video recording rebuts a self-defense theory, explained that it did because the driver of the gray car "could have just applied the brakes, pulled over on the side of the road. Also[,] there are exits that [he] could have taken before this, and that was never done either." Lukowsky also agreed that a shot to the back is typically not something you would expect from a self-defense claim. The investigation led to the registered owner of the gray car, Bennett. Lukowsky and additional officers worked to obtain search

6

warrants for the vehicle and Bennett's residence. When he was stopped by the Fort Worth Police Department (FWPD), Bennett willingly agreed to go with Lukowsky and Detective Chris Javarone from the APD to talk.

In his recorded interview with Lukowsky and Javarone, Bennett admitted to shooting Turner. Bennett told the officers that he first saw Turner at a gas station and noticed the patches on his vest and Aryan Brotherhood tattoos. Bennett then admitted that he gave Turner "a look" while leaving the gas station and proceeded onto the highway. According to Bennett's statement, Turner followed him onto the highway, even though Bennett attempted to make evasive maneuvers to keep away from Turner. Bennett stated that Turner pulled alongside him and yelled, "I'm going to kill you, faggot," and reached for something with his left hand, at which point Bennett "feared for [his] life" and shot Turner. Bennett immediately took the next exit off the highway and then proceeded to pick up his daughter in Fort Worth before tossing his gun "in the woods" and removing stickers from his vehicle.

After the interview, the officers took Bennett to his house, where a search warrant was executed. During the search of Bennett's house, it was noted that Bennett had a desk that had a sticker on it with boxing gloves that said, "Punch Nazis," as well as a sticker stating "A. C. A. B. Means Joe and Kamala Too." Javarone testified that "A.C.A.B." generally stood for "all cops are bad."

An arrest warrant was also being signed during Bennett's home search, and when the warrant was signed, Lukowsky placed Bennett under arrest. Subsequent to Bennett's arrest, he led officers to the spot where he left his firearm, and it was collected. Mateo Serfontein, a

7

forensic firearm and toolmark examiner, confirmed the shell casings located at the crime scene and the bullets removed from Turner's body were all fired from Bennett's retrieved firearm.

Javarone also testified regarding the investigation and his interviews with Bennett. While he agreed that Bennett told him that Turner said he was going to kill Bennett, Javarone indicated that it would "be very difficult if that was true" for someone to hear a threat over the noise of a Harley Davidson motorcycle going sixty miles per hour on the highway while playing loud music. Furthermore, Javarone noted that while Bennett assumed Turner was reaching for a gun when he made the threat, no gun was found on the scene, Turner's person, or motorcycle. Javarone agreed that Bennett's behavior after the incident also did not support a self-defense theory—Bennett did not call authorities, he hid the firearm, he removed stickers from his vehicle, he did not tell his partner about the incident, nor did he attempt to turn himself in. Javarone stated that based on Bennett's interviews and the evidence collected during the investigation, he did not believe Bennett's self-defense claim.

Kyle Pisula, a criminal investigator with the Tarrant County Criminal District Attorney's Office in the Digital Forensics and Technical Services unit, performed the digital forensic extractions of Turner's and Bennett's cell phones. Photographs from Bennett's cell phone were admitted and published to the jury which depicted Bennett wearing a vest with patches that stated, "NAZI LIVES DO NOT MATTER," "SOCIAL JUSTICE WARRIOR," "BORN TO CAUSE MAYHEM," and "MY OTHER JOB IS KILLING NAZIS." Javarone also testified to images found on Bennett's cell phone that caused him concern, including screenshots from Facebook of Turner that were saved after the incident.

8

Bennett testified on his own behalf and explained that he is pansexual, which he described as "gender and sex do not really come into account when [he] feel[s] an attraction towards someone." On the day of the shooting, Bennett stated that he was driving and stopped to get gas, he paid inside the store, and as he was exiting the store, he and Turner passed each other in the doorway, though, he stated he did not think Turner noticed him. Turner was wearing a vest displaying his Aryan Brotherhood membership, which Bennett understood as a "belief in white supremacy, anti-queer violence, and obviously a criminal lifestyle." Bennett testified that he had previously been harmed by a white-supremacy group, though not the Aryan Brotherhood. He stated that as he was leaving the gas station, Turner got behind him, but he thought Turner "had plenty of time to leave before [Bennett] did." While driving, Bennett stated that he tried to go faster to get away from him, but that Turner repeatedly caught up to him. He explained that Turner was also "splitting lanes" and cutting around vehicles to remain behind Bennett. Bennett explained that he thought maybe he was "in the way" and the motorcycle just needed to get past him, so he switched lanes to give Turner the opportunity to go around or pass him.

Bennett stated that at the end of July, it was "at least 100 degrees," and his air conditioning did not blow cold, so he would open his windows when driving "on the freeway." While on the freeway, Bennett explained that Turner got beside his vehicle and "[they] made eye contact" and then Turner got closer to his vehicle and very clearly stated, "I'm going to kill you, Faggot." Bennett said that he clearly heard Turner, over the wind noise, music, and motorcycle noise. At that point, Bennett explained he feared for his life. After the threat was made, Turner then began to lower his left arm, so Bennett started to accelerate, but Turner did as well. Bennett

then said he slowed down and, as he turned the wheel toward the exit, he fired his weapon toward Turner.

Bennett testified specifically as to self-defense, stating that he never wanted to kill Turner, but that he had the right to defend himself and should not wait to get shot when you believe the other person has a weapon. He admitted he removed bumper stickers from his vehicle after the incident but explained that he did so to keep himself and his family safe from any retaliation. He also hid his firearm because he was attempting to "absolve [him]self from anything" related to the shooting to prevent being targeted, which he explained is also why he did not turn himself in.

On cross-examination, Bennett agreed that he had strong political and social beliefs, including anarchy. He admitted to wearing clothing with patches which suggested killing Nazis. He agreed that his beliefs are that white supremacists are not good people and they have violent tendencies. Bennett agreed that he had conversations with friends and his partner regarding his dislike and distrust of the current state of the government and legal system. He also agreed that members of the Aryan Brotherhood are fundamentally against his beliefs and his existence. Bennett argued that even though he shot Turner from behind, Turner was still a threat to him at that time, so Bennett used his firearm to make space for himself in order to exit the highway and get away from Turner. He stated several times that he did not believe he actually shot Turner, just that he was attempting to create space between the two of them after Turner threatened him.

The jury subsequently found Bennett guilty of murder as charged in the indictment, and after the punishment portion of the trial, sentenced Bennett to fifty years' incarceration. From

10

that conviction, Bennett appeals.

## II.     Self-Defense Theory

In his first issue, Bennett contends that his conviction is "contrary to established Texas justification laws after [his] use of force was in self-defense." Bennett contends that he "reasonably believed force was immediately necessary to protect against the gang member's use or attempted use of unlawful force."

### A.     Standard of Review

Self-defense is a fact issue to be determined by the jury, and a jury's verdict of guilt is an implicit finding that it rejected a defendant's theory of self-defense. *Braughton v. State*, 569 S.W.3d 592, 609 (Tex. Crim. App. 2018) (quoting *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991)). For a justification defense, the defendant has the burden of producing some evidence to support his claim. *Id.* at 608 (citing *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003)); *see also Saxton*, 804 S.W.2d at 913–14 (contrasting affirmative defenses and explaining how burdens shift for self-defense).

> The shifting burdens that apply and the context in which we review a self-defense claim are as follows:
>
> This Court's precedent holds that, in a claim of self-defense or defense of third persons that would justify a defendant's use of force against another, the defendant bears the burden to produce evidence supporting the defense, while the State bears the burden of persuasion to disprove the raised issues. *Zuliani*[, 97 S.W.3d at 594]; *Saxton*[], 804 S.W.2d [at] 913–14. The defendant's burden of production requires him to adduce some evidence that would support a rational finding in his favor on the defensive issue. *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013). By contrast, the State's burden of persuasion "is not one that requires the production of evidence; rather it requires only that the

> State prove its case beyond a reasonable doubt." *Zuliani*, 97
> S.W.3d at 594 (citing *Saxton*, 804 S.W.2d at 913).

*Taylor v. State*, No. 02-25-00150-CR, 2026 WL 1261724, at *4 (Tex. App.—Fort Worth May 7, 2026, no pet.) (mem. op., not designated for publication) (third alteration in original) (quoting *Braughton*, 569 S.W.3d at 608–09).

In an evidentiary-sufficiency review, we view all the evidence in the light most favorable to the verdict to determine whether any rational fact-finder could have found the crime's essential elements beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Queeman v. State*, 520 S.W.3d 616, 622 (Tex. Crim. App. 2017). We give full play to the fact-finder's responsibility "to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Jackson*, 443 U.S. at 319; *Harrell v. State*, 620 S.W.3d 910, 914 (Tex. Crim. App. 2021) (quoting *Jackson*, 443 U.S. at 319).

"A reviewing court must 'defer to the jury's credibility and weight determinations because the jury is the "sole judge" of witnesses' credibility and the weight to be given testimony.'" *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021) (quoting *Garcia v. State*, 367 S.W.3d 683, 687 (Tex. Crim. App. 2012)); *see* TEX. CODE CRIM. PROC. ANN. art. 38.04. "We may not re-evaluate the evidence's weight and credibility and substitute our judgment for the factfinder's." *Taylor*, 2026 WL 1261724, at *3 (citing *Queeman*, 520 S.W.3d at 622). Rather, "we determine whether the necessary inferences are reasonable based on the evidence's cumulative force when viewed in the light most favorable to the verdict." *Id.* (citing *Braughton*, 569 S.W.3d at 608; *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017) ("The court conducting a sufficiency review must not engage in a 'divide and conquer' strategy

12

but must consider the cumulative force of all the evidence." (quoting *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015)))). "We must presume that the factfinder resolved any conflicting inferences in favor of the verdict, and we must defer to that resolution." *Id.* (citing *Braughton*, 569 S.W.3d at 608). "The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt." *Id.* (citing *Carter v. State*, 620 S.W.3d 147, 149 (Tex. Crim. App. 2021)).

**B.    Analysis**

Bennett argues that the evidence proves that his use of deadly force was justified under Section 9.32(a) of the Texas Penal Code, which states,

> (a)    A person is justified in using deadly force against another:
>
>> (1)    if the actor would be justified in using force against the other under Section 9.31 [of the Texas Penal Code]; and
>>
>> (2)    when and to the degree the actor reasonably believes the deadly force is immediately necessary:
>>
>>> (A)    to protect the actor against the other's use or attempted use of unlawful deadly force; or
>>>
>>> (B)    to prevent the other's imminent commission of aggravated kidnapping, murder, sexual assault, aggravated sexual assault, robbery, or aggravated robbery.

TEX. PENAL CODE ANN. § 9.32(a). A reasonable belief is "a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." TEX. PENAL CODE ANN. § 1.07(a)(42) (Supp.).

It is not the State's burden to disprove Bennett's claim of self-defense, but rather the State need only establish the elements of murder, which it did. *See Taylor*, 2026 WL 1261724,

13

at *5. "Whether the claim of self-defense was properly rejected turns not on whether the State offered evidence to rebut Appellant's self-defense claim but whether a rational trier of fact would 'have found against [A]ppellant on the self-defense issue beyond a reasonable doubt.'" *Id.* (alteration in original) (quoting *Saxton*, 804 S.W.2d at 914).

The evidence before the jury supports an inference that Bennett decided to shoot Turner because he believed that Turner's membership in a white-supremacy group presented a threat to Bennett. According to Bennett, this threat existed because Turner shouted a threat to him and reached toward his left hip. Even so, the jury saw video recordings that Bennett shot Turner from behind, saw Turner's hand placement during the shooting, heard testimony that the motorcycle was extremely loud, especially at the speeds they were traveling, and heard that both Turner and Bennett had loud music playing. The jury was entitled to look at the totality of the evidence before it and decide whether it believed Bennett's testimony regarding a yelled threat and slur, as well as a gesture to reach for a weapon. The jury was free to disbelieve Bennett's self-serving testimony, and to find it unreasonable that Bennett believed a use of deadly force was necessary to protect himself against Turner's alleged attempted use of unlawful-deadly force. *See* TEX. PENAL CODE ANN. § 9.32(a)(2)(A); *Taylor*, 2026 WL 1261724, at *5. Looking at the record as a whole, we find the jury was rational in its decision to reject Bennett's offered justification of self-defense.

We overrule Bennett's first issue.

## III.    Disproportionate Sentence

By his second issue, Bennett argues that his sentence of fifty years' incarceration is

14

grossly disproportionate to the crime committed in violation of the Eighth Amendment. Bennett, however, did not object to the sentence imposed. To preserve an issue for appellate review, an appellant must have first raised the issue in the trial court. TEX. R. APP. P. 33.1(a); *see also Gillenwaters v. State*, 205 S.W.3d 534, 537 (Tex. Crim. App. 2006) (discussing Rule 33.1 of the Texas Rules of Appellate Procedure).

A sentencing issue may be preserved by objecting at the punishment hearing or when the sentence is pronounced. *See, e.g.*, *Idowu v. State*, 73 S.W.3d 918, 923 (Tex. Crim. App. 2002) (appellant failed to preserve error as to restitution amount by failing to object at the punishment hearing to amount of restitution sought by the prosecution); *Russell v. State*, 341 S.W.3d 526, 527–28 (Tex. App.—Fort Worth 2011, no pet.) (appellant failed to preserve his Eighth Amendment complaint when he did not object at sentencing). In some instances, an appellant may preserve a sentencing issue by raising it in a motion for new trial. *See, e.g.*, *Bitterman v. State*, 180 S.W.3d 139, 142–43 (Tex. Crim. App. 2005) (appellant raised issue of plea breach in motion for new trial).

At no time did Bennett raise a specific objection claiming that the punishment the jury assessed violated constitutional protections against cruel and unusual punishment. Nor did he make a specific objection or complaint in a motion for new trial. *See Kim v. State*, 283 S.W.3d 473, 475 (Tex. App.—Fort Worth 2009, pet. ref'd) (citing TEX. R. APP. P. 33.1(a); *Rhoades v. State*, 934 S.W.2d 113, 120 (Tex. Crim. App. 1996)).

Under these circumstances, Bennett failed to preserve his Eighth Amendment complaint for our review. *See Washington v. State*, 271 S.W.3d 755, 756 (Tex. App.—Fort Worth 2008,

15

pet. ref'd) (per curiam); *Means v. State*, 347 S.W.3d 873, 874 (Tex. App.—Fort Worth 2011, no pet.); *see also Fulton v. State*, No. 02-19-00227-CR, 2020 WL 3969851, at *2 (Tex. App.—Fort Worth June 11, 2020, no pet.) (mem. op., not designated for publication).

We overrule Bennett's second issue.

## IV.    Conclusion

We affirm the trial court's judgment.


Scott E. Stevens
Chief Justice

Date Submitted:    March 25, 2026
Date Decided:    July 15, 2026

Do Not Publish